IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION

Case No. 09-60636-CIV-COHN-SELTZER

SIGNAL TECHNOLOGY, INC.,

       Plaintiff,

vs.

PENNSMMIT TUBULAR, LLC,

       Defendant.
_____/

**DEFENDANT'S MOTION TO EXCLUDE OR LIMIT CERTAIN TESTIMONY
OF PLAINTIFF'S EXPERT WITNESS, G. FRED WILLARD, PH.D**

Defendant, PennSummit Tubular, LLC (hereinafter "PennSummit" or Defendant), hereby moves for entry an order excluding or limiting certain testimony/opinions offered by Plaintiff's Expert, G. Fred Willard, Ph.D.  In support hereof, PennSummit states as follows:

**I.**      **INTRODUCTION AND GROUNDS FOR RELIEF**

On June 3, 2010, Plaintiff, Signal Technology, Inc. (hereinafter "Signal" or "Plaintiff") issued a Written Report of Expert Testimony wherein Signal detailed the substance of the opinions of G. Fred Willard, Ph.D., its liability expert in this case.  Dr. Willard primarily offered his opinions regarding the alleged cause for the paint delamation at issue in this case.  While PennSummit does not agree with the conclusions and opinions reached by Dr. Willard, two opinions/conclusions included in his report are not admissible.  First, Dr. Willard states that the mast arms *may* have been quenched in a water bath following the galvanizing process and that the quenching would make preparing the surface for painting more difficult.  This statement

-1-

relies completely on a statement told to him by Signal's Counsel and Dr. Willard admits in his deposition testimony that he did not perform any testing to determine that the mast arms were quenched. Additionally, Dr. Willard concludes in his report that "[w]here steel corrosion products such as iron oxide have compromised the steel of the mast arms, the entire structure must be replaced in accordance with Florida Department of Transportation requirements." However, during his deposition testimony, Dr. Willard readily admits that he not only has no evidence to support the fact that iron oxide has comprised the steel of any of the mast arms, he is not even qualified to provide such an opinion. Accordingly, and as more fully set forth below, Dr. Willard should be precluded form offering both of these opinions.

## II. DR. WILLARD'S UNSUPPORTED OPINION ON WATER QUENCHING

Signal intends to offer the expert testimony of G. Fred Willard, Ph.D. to provide testimony to the jury regarding his opinions/conclusions as to why the paint/coating on these galvanized and painted steel mast arms began to peel or delaminate. One of the opinions which Dr. Willard intends to offer is that the structures were quenched in a water bath following galvanization and that this quenching contributed to the paint peeling/delamination problem.[1] Specifically, Signal's written Report of Expert Testimony indicates that Dr. Willard intends to express, *inter alia*, the following opinion:

> It is understood that the galvanized mast arms (uprights and arms) may have been quenched in a water bath in the galvanizing process. Quenching in water may have added contamination to the zinc surface and may have resulted in a smoother surface. These two conditions certainly would make preparing the surface for painting more difficult.

*See* Plaintiff's Written Report of Expert Testimony, page 4, ¶ 7, attached as Exhibit "A."

---

[1] Quenching in a water bath is a process sometimes used by a galvanizer to cool the steel structure after it is removed from a hot zinc galvanization bath.

SCAGLIONE | QUESADA | BON  LLP
2600 DOUGLAS ROAD | PENTHOUSE 10 | CORAL GABLES, FLORDIA 33134 | 305.447.0392

Dr. Willard admitted at his deposition, however, that he did not have any support whatsoever to support his supposition that the mast arms were quenched after they were galvanized. Indeed, the only support that he had on this contested issue of fact was the hearsay assertions of Signal's Counsel, Joseph W. Lawrence, Esq. Specifically, Dr. Willard testified as follows:

> Q. Now, you say it was your understanding that there was quenching. From whom or where did you get that understanding?
>
> A. Joe Lawrence said that the galvanizer used a quench bath.
>
> Q. Did he tell you that the -- How - did he tell you how he was able to make that conclusion?
>
> A. There was -- No, he didn't tell me the source of information or anything, he just said --
>
> Q. Did you read the depositions from the galvanizers?
>
> A. No.
>
> Q. Okay. Did you know that the galvanizers were deposed in this case?
>
> A. I don't think so. Because that wasn't my focus.
>
> Q. Did Mr. Lawrence tell you that the galvanizers expressly stated they did not quench the product?
>
> A. No, I did not know that. I was under the impression that they did quench the product.
>
> Q. Okay. Other than Mr. Lawrence's statement to you that he believes that the galvanizer quenched the product, or he concluded that the galvanizer quenched the product**, were you able to perform or did you perform any independent testing to determine whether or not the structures were quenched?**
>
> A. **No.**

SCAGLIONE | QUESADA | BON  LLP
2600 DOUGLAS ROAD | PENTHOUSE 10 | CORAL GABLES, FLORDIA 33134 | 305.447.0392

Q. Okay. Is there anything in the report that would set - that would indicate one way or the other whether the galvanized structures were quenched?

A. Well, again, we found, I believe, calcium in the - as a trace element - in the EDXA work on the primer. Calcium is - is found in hard water. Like calcium -- I think it's calcium carbonate, or some calcium species floating around in hard water. So that could be an indicator, but it was, again, a trace amount and we did no hardness testing.

Q. **Okay. So the trace amount of calcium couldn't give you a definitive conclusion whether or not it was quenched, could it?**

A. **No.**

Q. **Did you just say that you didn't do a hardness test to determine if it was quenched?**

A. **I did not do, yeah**.

Q. Would a hardness test have been able to assist you to determine whether it was quenched?

A. No.

Q. No?

A. No.

Q. Okay. What type of testing could you have done to determine whether or not there was quenching involved here?

A. You need to do a comparison. You would need a sample that was known to be quenched around that time and you would need a sample of this material to compare it to.

Q. Okay.

A. Hardness testing may or may not point that out. I don't know how much difference you would see, but you've got to have something to control - to compare to. Right now I

SCAGLIONE | QUESADA | BON  LLP

2600 DOUGLAS ROAD | PENTHOUSE 10 | CORAL GABLES, FLORDIA 33134 | 305.447.0392

                just got a couple mast arm samples.  I can't tell 'cause I have nothing to compare it to.

Q.     You had mast arms -- Well, you had at least a mast arm that did not appear to be experiencing a coating failure on Powerline Road; correct?

A.     Correct.

Q.     **Did you do any testing to compare and contrast that sample with the other samples to be able to draw any conclusion whether or not the mast arm that was not experiencing coating failure and the mast arm that was experiencing coating failure was able to give you any indication whether or not the one that was indicating - was demonstrating coating failure was quenched?**

A.     **No.**

Q.     **So you didn't perform that analysis?**

A.     **No.**

*See* Deposition Transcript of G. Fred Willard, Ph.D., pp. 99-102; attached hereto as Exhibit "B."

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)("Daubert") require that the trial courts act as "gatekeepers" to ensure that speculative, unreliable expert testimony does not reach a jury. *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir. 2002). The burden is on the party offering the expert to show admissibility by a preponderance of the evidence. *Id. citing Daubert,* 509 U.S. at 592 n.10.  Rule 702 provides that expert testimony may be admissible if (1) it is based upon sufficient facts or data, (2) the testimony is the product of reliable principles, and (3) the expert has applied the principles and methods reliably to the facts of the case.

Dr. Willard's testimony on the issue of quenching is admittedly based <u>solely</u> upon what was told to him by Signal's Counsel.  Dr. Willard's testimony is not based upon any meaningful

data or testing, because he simply did not do any testing or analysis. Instead, he took the statement of Signal's Counsel on a disputed issue and adopted it as one of his opinions. This hardly qualifies as a scientific approach and, thus, this opinion/testimony should be inadmissible.

### III. DR. WILLARD'S UNSUPPORTED OPINION REGARDING "IRON OXIDE COMPROMISING THE STEEL OF THE MAST ARMS"

The majority of the opinion/report of Dr. Willard is dedicated to his conclusions on the mechanism of the coatings failure and his assertions regarding the cause of the coatings failure. However, following these opinions/conclusions, Dr. Willard makes the following unsupported statement regarding the presence of rust/iron oxide on the steel mast arms:

> Where steel corrosion products such as iron oxide have compromised the steel of the mast arms, the entire structure must be removed and replaced in accordance with the Florida Department of Transportation requirements.

*See* Plaintiff's Written Report of Expert Testimony, page 5, attached as Exhibit "A." At his deposition, Dr. Willard readily admitted that he could not offer, and is not qualified to offer, any opinions regarding whether there is the presence of rust/iron oxide on these structures or whether (or to what extent) the rust/iron oxide could or would compromise the integrity of the steel such that any of the structures must be removed and replaced. Specifically, Dr. Willard provided the following testimony:

> Q.   When doing these core samples, what we have here, did you form any opinions or come to any conclusions regarding whether or not the - there's iron oxide present that compromises the integrity of the steel?
>
> A.   The short answer is no. Now, we did find some aluminum - I'm sorry - some iron oxide on the outside of that one sample where there's no - no coating left. So I have really no opinion about compromising the steel. I'm not an engineer, that would be someone else's determination.

Q. Okay. So you haven't performed any tests or analysis to determine whether or not the - there's the presence of iron oxide that actually compromises the steel?

A. No. …

\* \* \*

Q. Out of any of the eight pieces that you tested, did any of them indicate the presence of iron oxide that would compromise the integrity of the steel?

A. Well, we only found one that showed iron oxide.

Q. Okay.

A. Now -- That we tested. We saw another one that had iron oxide probably on the inside. But, again, I can't - I didn't do any test to determine the structural integrity of the steel because that wasn't my assignment. My assignment was simple: Why did the paint fail. And I had to take that assignment.

Q. Are you able to tell visually whether or not the presence of the iron oxide compromises the steel?

A. Like I said, I'm not a metallurgist, I have no opinion there.

\* \* \*

Q. Did you do any test or make any determination as to whether or not that rust could just be brushed off?

A. No.

Q. Did you attempt to just brush it off?

A. No.

Q. Did you do any tests or analysis or do anything to allow you to conclude whether or not that rust was actually affecting or not affecting the integrity of the steel?

A. No, wasn't interested in that.

SCAGLIONE | QUESADA | BON  LLP

2600 DOUGLAS ROAD | PENTHOUSE 10 | CORAL GABLES, FLORDIA 33134 | 305.447.0392

*See* Deposition Transcript of G. Fred Willard, Ph.D., pp. 158-160; 167-168; attached hereto as Exhibit "B."

The *Daubert*/gatekeeper analysis is equally applicable here.  It is well-settled that an expert's opinion is not admissible where that witness will be testifying to an area outside, although related to, his area of expertise because an expert witness "must stay within the reasonable confines of his subject area." *See In re Trasylol Products Liability Litigation*, 2010 WL 1489793, * 11 (S.D.Fla. 2010).  Here, Dr. Willard does not even attempt to assert that he did any testing to determine whether, or to what extent, iron oxide must be present in order to compromise the steel mast arms and require replacement thereof.  He admits that this is not his field of expertise.  If Signal wanted to offer an opinion from a metallurgist, it should have hired one.  Signal cannot now make Dr. Willard a 'jack-of-all-trades' and carry the burden for all of the opinions Signal wishes to assert in this case.  Accordingly, any opinion testimony from Dr. Willard regarding whether, or to what extent, the presence of "steel corrosion products such as iron oxide" would compromise the integrity of these mast arms is clearly (and admittedly) outside of his area of expertise and should be excluded.

SCAGLIONE | QUESADA | BON  LLP
2600 DOUGLAS ROAD | PENTHOUSE 10 | CORAL GABLES, FLORDIA 33134 | 305.447.0392

WHEREFORE, for the ground set forth above, this Court should exclude any testimony or opinions of Signal's expert witness, G. Fred Willard, Ph.D. regarding either the issue of whether the structures were quenched in a water bath or whether, and to what extent, steel corrosion products such as iron oxide (rust) could or has compromised the integrity of the steel mast arms in this case.

Respectfully submitted,

**/s/ Michael D. Bon**
**MICHAEL D. BON**
Fla. Bar No. 117897
bon@sqblaw.com
**SCAGLIONE, QUESADA & BON, LLP**
2600 Douglas Road, Penthouse 10
Coral Gables, Florida  33134
Tel:    305-447-0392
Fax:    305-447-0389
*Attorneys for PennSummit Tubular, LLC*


**/s/ Steven W. Cornman, Jr.**
**STEVEN W. CORNMAN, JR.**
Fla. Bar No. 755281
sc@kubickidraper.com
**KUBICKI DRAPER**
25 West Flagler Street, Penthouse
Miami, Florida  33130
Tel:    305-374-1212
Fax:    305-374-7846
*Co-Counsel for PennSummit Tubular, LLC*

**CERTIFICATE OF SERVICE**

      I certify that on July 8, 2010, I filed the foregoing document with the Clerk of the Court. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

      /s/ Michael D. Bon
      Michael D. Bon, Esq.