UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-60636-CIV-COHN-SELTZER

SIGNAL TECHNOLOGY, INC.,

     Plaintiff,

vs.

PENNSUMMIT TUBULAR, LLC,

     Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment [DE 91] ("Motion"). The Court has carefully considered the Motion, the parties' related submissions, the record in this case, and is otherwise advised in the premises.

### I. BACKGROUND

This action arises out of two construction projects, which included the installation of traffic signals, in Broward County, Florida. Plaintiff Signal Technology, Inc. ("Signal") entered into contracts with third-parties to furnish labor and materials for the two separate projects. In connection with these projects, Signal entered into contracts with Defendant PennSummit Tubular, LLC ("PennSummit") whereby PennSummit agreed to furnish "mast arms," which are overhead structures used in the construction of traffic signals. Signal alleges that the mast arms provided by PennSummit were defective and the Amended Complaint [DE 10] brings claims for breach of contract, breach of the implied warranties of merchantability and fitness for a particular purpose, and indemnification.

## 1.    Powerline Project

Ranger Construction Industries, Inc. ("Ranger"), pursuant to a contract ("Ranger Prime Contract") with Florida's Department of Transportation ("FDOT"), is the prime contractor on a construction project involving State Road 845, i.e., Powerline Road ("Powerline Project"). On or about August 27, 2004, Signal entered into an agreement with Ranger ("Ranger Subcontract") to furnish labor and materials for the installation of traffic signals and signage along a portion of the Powerline Project.

Signal's scope of work under the Ranger Subcontract included installation of overhead structures necessary for traffic signals and signage. Signal purchased these mast arms from PennSummit. The mast arms were to be galvanized and painted to conform with the requirements of the Ranger Subcontract, which incorporates FDOT requirements, standards and oversight.

The mast arms were delivered by PennSummit to the Powerline Project site on December 9, 2004, and subsequently installed and incorporated into the Powerline Project by Signal. Thereafter, on May 9, 2008, Ranger was notified by FDOT that the paint on the mast arms on the Powerline Road Project was peeling and that the paint failure was the result of corrosion of the mast arms.

## 2.    Oakland Park Project

APAC-Southeast, Inc. ("APAC"), pursuant to a contract ("APAC Prime Contract") with FDOT, is the prime contractor on a construction project to furnish labor and materials for the installation of traffic signals along a portion of State Road 816 ("Oakland Park Project"). On or about April 11, 2006, Signal entered into an agreement

2

with APAC ("APAC Subcontract") to furnish labor and materials for the installation of traffic signals and signage in connection with the Oakland Park Project.

Signal's scope of work under the APAC Subcontract included installation of mast arms for traffic signals and signage and Signal purchased these mast arms from PennSummit. The mast arms were to have been galvanized and painted to conform with the requirements of the APAC Subcontract, which also includes FDOT's standards.

The mast arms were delivered by PennSummit to the Oakland Park Project site on April 5, 2006, and subsequently installed and incorporated into the Powerline Project by Signal. Nearly two years later, on March 6, 2008, APAC was notified by FDOT that the paint on the mast arms on the Powerline Road Project was peeling and that the paint failure was the result of corrosion of the mast arms.

## 3. The Instant Action

On March 31, 2009, Signal filed a complaint in state court against PennSummit seeking recovery of damages related to the allegedly defective mast arms. This action was removed by PennSummit to this Court on April 30, 2009. The operative complaint, Signal's Amended Complaint [DE 10], was filed on May 26, 2009. The Amended Complaint sets forth the following five claims against PennSummit:

| | |
|---|---|
| Count I: | Breach of Contract (with regard to the Powerline Project) |
| Count II: | Breach of Contract (with regard to the Oakland Park Project) |
| Count III: | Breach of an Implied Warranty of Merchantability |
| Count IV: | Breach of an Implied Warranty of Fitness for a Particular Purpose |
| Count V: | Common Law Indemnity |

## 4. Signal's Damages

Signal seeks recovery in this action of the costs relating to repair and/or

3

replace the structures which are allegedly defective. It is undisputed that, to date, Signal has not effectuated any such repair and/or replacement of the mast arms. When filing its original Rule 26 Disclosures on June 18, 2009, Signal stated that it "is in the process of calculating its damages. Signal will supplement its response to this item after its damages have been determined." DE 92 ¶ 11.

On November 2, 2009, Signal first disclosed its potential damages when Signal responded to PennSummit's first set of interrogatories. With regard to both projects, Signal disclosed that it was seeking a combined total of $650,459.59 which was allegedly necessary to replace certain structures and to repair/repaint the remainder.

Specifically, the Oakland Park Project includes twenty-six structures (which consists of twenty-six uprights and twenty-seven mast arms). According to its November 2, 2009 interrogatory answers, Signal asserted that, with regard to the Oakland Park Project, only seven mast arms needed to be replaced and the remainder of the structures needed to be repainted. With regard to the Powerline Project, Signal asserted that its damages consisted of the costs of replacing one mast arm and repainting the remaining affected six uprights.

In May 2010, Signal's Executive Vice President, Jeffrey M. Kleiss, determined that "due to the evident . . . rapidly deteriorating condition of the mast arms, . . . the mast arm structures must be removed and replaced." DE 99-1 ¶ 16. Accordingly, on June 9, 2010 (subsequent to the expiration of the deadline to provide expert summaries and reports and only two days prior to the fact discovery cut-off), Signal disclosed new damages claims. Signal now asserts a claim for damages which is nearly double its original damages calculation: $1,142,842.00. This new figure is premised upon Signal's

4

assertion that its prospective damages could now include the cost of replacing all twenty-six mast arms on the Oakland Park Project and replacing six mast arms on the Powerline Project.

## 5. Related State Court Proceedings

Several months following the commencement of this action, FDOT sued Ranger and APAC in separate lawsuits currently pending in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida. Both of the state court actions are still pending and they have not been adjudicated, settled or otherwise discharged. According to Signal, "[i]n each of those cases, Signal has recognized its contractual obligations to APAC and Ranger and has agreed to defend and indemnify APAC and Ranger for any damages they incur in those lawsuits." DE 99 at 10-11.

## II. LEGAL STANDARD

The Court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When deciding a motion for summary judgment, a district court must consider all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and must resolve all reasonable doubts against the moving party." Corbitt v. Home Depot U.S.A., 573 F.3d 1223, 1238 (11th Cir. 2009). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S.

5

317, 323 (1986).

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). According to the plain language of Rule 56(e), the non-moving party "may not rely merely on allegations or denials in its own pleading," but instead must come forward with "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

## III. ANALYSIS

### 1. Standing and Ripeness

PennSummit states that the "damages being sought by Signal consist of the cost to either repair and/or replace the overhead structures at issue in this case." DE 91 at 4. PennSummit's Motion makes two separate arguments. First, PennSummit argues Signal lacks standing because "Signal itself has not suffered any injury or damage." Id.

6

at 6.  Second, PennSummit argues that the damages in this case are unripe and

speculative because they related to future repair and/or replacement costs.

Specifically, PennSummit argues the following:

> It is clear . . . that, to date, Signal has not incurred any damages relating
> to the cost to either repair or replace these structures.  In fact, to date, the
> affected overhead structures have been neither repaired nor replaced.
> Additionally, these structures are not the property of Signal since, upon
> completion and acceptance of each of these roadway construction
> projects, title passed to FDOT.  Consequently, . . . Signal does not have
> standing to assert these damages claims and, likewise, Signal's damages
> claims are not sufficiently ripe for adjudication.  Since damages are an
> essential element of each of Signal's claims against PennSummit,
> PennSummit is entitled to summary judgment as a matter of law.

Id. at 4-5.

In response, Signal contends that PennSummit's argument is "an apparent

reflection of PennSummit's misunderstanding that Signal should have repaired

PennSummit's defective mast arms first before bringing this action against

PennSummit. Such is not the case."  DE 99 at 4.  According to Signal, Florida law

provides that "repairs to a subcontractor's work do not need to have been started for a

claim to go forward.  The anticipated cost of repair must be shown with reasonable

certainty."  Id. at 4.

### A.    Applicable Law

The general rule in breach of contract cases is to award damages sufficient to

place the injured party in as good a position as he or she would have been had the

breaching party fully performed.  Lazovitz, Inc. v. Saxon Constr., Inc., 911 F.2d 588,

591 (11th Cir. 1990).  The damages must be established with reasonable certainty as

flowing from the wrong alleged.  Westbrook v. Bacskai, 103 So. 2d 241 (Fla. Dist. Ct.

App. 3d Dist. 1958).  Damages which flow naturally from the breach, and were

7

foreseeable by the breaching party at the time the contract was entered, are recoverable. Scott v. Rolling Hills Place, Inc., 688 So. 2d 937, 940 (Fla. Dist. Ct. App. 5th Dist. 1996). Further, in an implied warranty action, the buyer is entitled to both incidental and consequential damages which are proximately caused by the breach of warranty. Marcus v. Anderson/Gore Homes, Inc., 498 So.2d 1051, 1053 (Fla. Dist. Ct. App. 4th Dist. 1986).

Where responsibility for damages is clear, it is not essential that the amount of damages be ascertainable with absolute exactness or mathematical certainty. San Carlos Irrigation and Drainage Dist. v. United States, 111 F.3d 1557, 1563 (11th Cir. 1997). The standard for the degree of certainty requires the mind of a prudent and objective person to be satisfied with the damages. Conner v. Atlas Aircraft Corp., 310 So.2d 352, 354 (Fla. Dist. Ct. App. 3d Dist. 1975) (inability to give the exact or precise amount of damages does not preclude recovery so long as there is a reasonable basis in the evidence for the amount awarded); Reitano v. Peninsular Bldg. Supply Co., 262 So.2d 710, 711 (Fla. Dist. Ct. App. 2d Dist. 1972) (it is sufficient if there is a reasonable basis of computation although the result may only be approximate).

Future damages that may arise from the alleged wrongful conduct are unrecoverable if the fact of their accrual is speculative or their amount or nature unprovable. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 339 (1971). The critical inquiry, however, is whether the damages are speculative and the law is clear that future damages are not, by definition, speculative. "Florida courts allow contractors to recover when necessary repairs, occasioned by a breach, have not been started; the contractor must be able to show the anticipated cost with reasonable certainty." Lazovitz, Inc. v. Saxon Constr., Inc., 911 F.2d 588, 591 (11th Cir. 1990)

(emphasis in original) (citing Lynch v. Fla. Mining & Materials Corp., 384 So. 2d 325,

327-28 (Fla. Dist. Ct. App. 2d Dist. 1980); B & J Holding Corp. v. Weiss, 353 So. 2d

141, 143 (Fla. Dist. Ct. App. 3d Dist. 1977)). "Under the certainty rule, which applies in

both contract and tort actions, recovery is denied where the fact of damages and the

extent of damages cannot be established within a reasonable degree of certainty."

Miller v. Allstate Ins. Co., 573 So. 2d 24, 27-28 (Fla. Dist. Ct. App. 3d Dist. 1990) (citing

Restatement (Second) of Contracts § 352 (1981); Restatement (Second) of Torts § 912

(1982); McCall v. Sherbill, 68 So. 2d 362 (Fla. 1953)); accord Richard A. Lord, Williston

on Contracts § 64:8 ("The amount of damages must be established with reasonable,

not absolute, certainty. . . . It is sufficient if a reasonable basis for computation of

damages is afforded, even though the result will only be approximate.").

       This case is similar to the situation the court faced in Nebula Glass Int'l, Inc. v.

Reichhold, Inc., 454 F.3d 1203 (11th Cir. Fla. 2006).[1]  There, the plaintiff, a supplier of

glass laminating resin, filed an action against a chemical company alleging that it

supplied the plaintiff with defective resin.  The defendant moved for judgment as a

matter of law arguing, *inter alia*, that plaintiff's damages for certain future glass

replacement were "wholly speculative."  Id. at 1212.  Specifically, defendant argued that

"(1) the college's glass had not yet failed, and may never do so; and (2) Dependable

Glass, the contractor that manufactured and installed the college's glass with the

---

       [1]      The Court notes that in Nebula, the Eleventh Circuit was reviewing a
motion for judgment as a matter of law rather than a motion for summary judgment.
Nevertheless, the analysis contained in Nebula is instructive here.  Moreover, the
standard for judgment as a matter of law is similar to the standard governing the instant
Motion.  See Nebula, 454 F.3d at 1210 ("[W]e have explained that the court should
deny a motion for judgment as a matter of law if the plaintiff presents enough evidence
to create a substantial conflict in the evidence on an essential element of the plaintiff's
case.") (internal quotation and citation omitted).

defective resin [plaintiff] supplied, had not yet made, and may never make a replacement claim." Id. The Eleventh Circuit disagreed and affirmed the district court holding that "[plaintiff] presented sufficient evidence at trial that, if construed in a light most favorable to [plaintiff], established with reasonable certainty both that the College's glass will fail and that Dependable Glass will seek replacement costs." Id. Likewise, the Court finds that Signal has presented sufficient evidence to survive a motion for summary judgment.

B.      Standing

PennSummit argues that "Signal lacks the requisite standing to proceed in this action against PennSummit based upon the alleged future cost to repair and/or replace the property of a third party (here, FDOT)." DE 91 at 6. Here, FDOT has brought suits demanding that APAC and Ranger correct the defective mast arms furnished by PennSummit. In turn, APAC and Ranger demanded that Signal hold both contractors harmless in connection with these claims. Signal entered into joint defense and indemnification agreements with both APAC and Ranger in which Signal agreed to defend, indemnify and hold the contractors harmless from FDOT's claims. Indeed, Signal has unequivocally stated that "Signal is responsible to APAC and Ranger for the peeling and rust mast arm structures furnished by PennSummit." DE 99 at 6.

This presents an even stronger case than Nebula in which the third-parties had not yet filed claims against the plaintiff. See Nebula, 454 F.3d at 1213 ("The possibility that the college and Dependable Glass would fail to seek recovery from [plaintiff] for replacement of the defective glass is, indeed, remote."). Accordingly, the Court rejects PennSummit's argument that summary judgment should be granted for lack of standing.

### C.    Ripeness

PennSummit argues that "Signal's damages claim is not ripe for adjudication. Indeed, Signal is seeking relief for some unknown prospective future injury rather than relief for damages is has already sustained.  Signal cannot even quantify its damages since it does not know which, if any, of the overhead structures need to be replaced." DE 91 at 7.

Conversely, Signal contends that it has presented sufficient evidence to ascertain damages with reasonable certainty.  Signal states that "[i]t is undisputed that the paint is peeling from the mast arms."  DE 99 at 4.  Signal has also submitted expert testimony, "based upon a reasonable degree of scientific certainty," that the "root cause of the peeling paint issue is that the mast arms were not properly surface prepared prior to painting . . . ."  DE 92-5 at 4.  In addition, Signal relies on the testimony of Mr. Kleiss to support its claim that all of the mast arms need to be replaced. See DE 99 at 13. "Signal has disclosed damages of between $650,459.59 and $1,142,842.00 [DE 92-3] depending on the number of mast arms the jury finds need to be replaced as opposed to being repaired."  DE 99 at 8.

The evidence presented by Signal is similar to the evidence relied on by the plaintiff in Nebula. See Nebula, 454 F.3d at 1212-13 (finding expert testimony and past failures constituted sufficient evidence for the jury to conclude that certain glass was reasonably certain to fail within five years).  Moreover, in Lazovitz, Inc. v. Saxon Construction, Inc., 911 F.2d 588, 591 (11th Cir. 1990), the lower court held that the plaintiff could not sue under a construction contract because it failed to show actual expenditures occasioned by a breach.  There, the district court required the plaintiff to show current out-of-pocket loss, concluding that any other losses would be too

11

speculative to support their recovery as damages. Id. The Eleventh Circuit, however, disagreed and found that the amount of loss occasioned by the breach must only be proven with reasonable certainty. Id. Further, the appellate court noted that Florida courts allow contractors to recover when necessary repairs, occasioned by a breach, have not been started as long as the contractor is able to show the anticipated costs with reasonable certainty. Id. (citing Lynch v. Florida Min. & Materials Corp., 384 So. 2d 325, 327-28 (Fla. Dist. Ct. App. 2d Dist. 1980)).

Viewing the evidence in the light most favorable to the non-moving party, the Court finds that Signal has presented sufficient evidence to survive a motion for summary judgment. At trial, Signal will be required to establish its damages with reasonable certainty and PennSummit may argue to the jury and the Court that Signal fails to meet this standard.[2]

## 2.    Signal's Supplemental Disclosure of Damages

PennSummit states that "Signal claims, as a potential element of its damages, that all of the affected overhead structures may need to be replaced (as opposed to repaired) and that the total cost of this prospective damages claim is $1,142,842.00." DE 91 at 7. PennSummit argues that it is entitled to partial summary judgment because "this element of damages (a) was belatedly filed/asserted, (b) is unsupported by any evidence in the record and (c) and is lacking any evidence relating to causation." Id. at 7-8.

Signal responds by arguing that it timely supplemented its disclosures upon discovery of new information and that Signal has provided sufficient evidence to create

---

[2]    For the same reasons, the Court rejects PennSummit's alternative argument that the case should be dismissed pursuant to Rule 12(b)(1).

a genuine issue of material fact regarding this element of damages. See DE 99 at 12-13.

With respect to the timeliness of Signal's disclosure, the Court declines to address this issue in the context of a motion for summary judgment. Instead, the Court will rule on whether or not to exclude certain evidence based on untimely disclosures after hearing oral argument on PennSummit's motions in limine.

With respect to Signal's purported lack of evidence, Signal argues as follows:

> Mr. Kleiss's affidavit provides competent record evidence that all of the mast arms need to be replaced. PennSummit – the party seeking summary judgment on Signal's claim that all of the mast arms need to be replaced – has filed no record evidence suggesting that less than all of the mast arms need to be replaced [DE 91, pp. 7-14]. Assuming *arguendo* PennSummit had filed such evidence in the record – Mr. Kleiss's affidavit would create a genuine issue of material fact to be resolved by the jury.

DE 99 at 13. The Court agrees. Further, as discussed above in the section dealing with "Ripeness," the Court finds that Signal's evidence is sufficient to survive a motion for summary judgment.

## 3.  Signal's Claim for Breach of Warranty of Fitness for a Particular Purpose

In connection with Count IV, Signal alleges that PennSummit "impliedly warranted that the good, i.e., mast arms, it was selling to Signal were fit for the particular purpose of supporting overhead traffic signals and signage for the Powerline and Oakland Park Projects." DE 10 ¶ 43. Signal further alleges that PennSummit breached this warranty. Id. ¶ 46.

PennSummit argues that it is "entitled to summary judgment in its favor on this count because: (1) this allegation does not support an implied warranty of 'fitness for a particular purpose' under Florida law; and (2) in any event, there is no testimony that the mast arms and uprights as delivered and as used to this day have not served their

alleged 'purpose of supporting overhead traffic signals and signage for the Powerline and Oakland Park Projects.'" DE 91 at 15. PennSummit asserts that "[o]ther than aesthetic complaints relating to the peeling paint coating on the mast arms and uprights, they have fully met their anticipated utility and primary purpose in supporting the traffic signals and signs without a single incident or problem." Id. at 16 (emphasis in original).

> In response, Signal contends as follows:

> As Signal alleges in paragraphs 43 and 44 of its Amended Complaint, PennSummit impliedly warranted to Signal that it would provide structures fit for the purpose of supporting overhead signals and signage on the two Projects, meaning that the poles would satisfy the particularized requirements and exacting standards for such structures as promulgated by FDOT. [DE 10 ¶¶ 43-44]. PennSummit's structures failed to meet these standards because they do not conform with the required specifications and, as such, PennSummit breached its implied warranty of fitness for the particular purpose described in Signal's Amended Complaint.

DE 99 at 15. The Court concludes that Count IV survives summary judgment as Signal has created a genuine issue of material fact regarding whether the mast arms failed to comply with FDOT specifications and, therefore, constitute a breach of an implied warranty of fitness for a particular purpose.

### 4.    Signal's Claim for Common Law Indemnity

In its Opposition, Signal states that it has "voluntarily dropped the common law indemnity claim." DE 99 at 2 n.1. PennSummit correctly argues that Rule 41(a)(1)(A) "precludes Signal from taking such action." DE 104 at 9. Rule 41(a)(1)(A) provides that a party may unilaterally dismiss a claim only before "the opposing party serves either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1)(A)(I). Accordingly, the Court will grant Defendant's Motion for Summary Judgment with respect to Count V

for common law indemnification.

## IV. CONCLUSION

Based on the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment [DE 91] is **GRANTED in part and DENIED in part**. Defendant's Motion is **GRANTED** with respect to Count V (Common Law Indemnity) and it is **DENIED** in all other respects.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, on this _3RD_ day of August, 2010.

**JAMES I. COHN**
**United States District Judge**

Copies provided to:

Counsel of record via CM/ECF