UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-60636-CIV-COHN-SELTZER

SIGNAL TECHNOLOGY, INC.,

      Plaintiff,

vs.

PENNSUMMIT TUBULAR, LLC,

      Defendant.

_____/

## ORDER REGARDING DEFENDANT'S COMBINED RENEWED MOTION TO DISMISS OR, ALTERNATIVELY, MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR REMITTITUR

**THIS CAUSE** is before the Court on Defendant's Combined Renewed Motion to Dismiss or, Alternatively, Motion for Judgment as a Matter of Law and Motion for Remittitur [DE 154] ("Motion"). The Court has carefully considered the Motion, the parties' related submissions, the record in this case, and is otherwise advised in the premises.

### I. BACKGROUND

This action arises out of two construction projects, which included the installation of traffic signals, in Broward County, Florida. Plaintiff Signal Technology, Inc. ("Signal") entered into contracts with third-parties to furnish labor and materials for the two separate projects. In connection with these projects, Signal entered into contracts with Defendant PennSummit Tubular, LLC ("PennSummit") whereby PennSummit agreed to furnish "mast arms," which are overhead structures used in the construction of traffic signals.

Signal alleged that the mast arms provided by PennSummit were defective and the Amended Complaint brought claims for breach of contract, breach of the implied warranties of merchantability and fitness for a particular purpose, and indemnification. See DE 10.

## 1.    Powerline Project

Ranger Construction Industries, Inc. ("Ranger"), pursuant to a contract ("Ranger Prime Contract") with Florida's Department of Transportation ("FDOT"), is the prime contractor on a construction project involving State Road 845, i.e., Powerline Road ("Powerline Project"). On or about August 27, 2004, Signal entered into an agreement with Ranger ("Ranger Subcontract") to furnish labor and materials for the installation of traffic signals and signage along a portion of the Powerline Project.

Signal's scope of work under the Ranger Subcontract included installation of overhead structures necessary for traffic signals and signage. Signal purchased these mast arms from PennSummit. The mast arms were to be galvanized and painted to conform with the requirements of the Ranger Subcontract, which incorporates FDOT requirements, standards and oversight.

The mast arms were delivered by PennSummit to the Powerline Project site on December 9, 2004, and subsequently installed and incorporated into the Powerline Project by Signal. Thereafter, on May 9, 2008, Ranger was notified by FDOT that the paint on the mast arms on the Powerline Road Project was peeling and that the paint failure was the result of corrosion of the mast arms.

## 2.    Oakland Park Project

APAC-Southeast, Inc. ("APAC"), pursuant to a contract ("APAC Prime Contract") with FDOT, is the prime contractor on a construction project to furnish labor and materials for the installation of traffic signals along a portion of State Road 816 ("Oakland Park Project"). On or about April 11, 2006, Signal entered into an agreement with APAC ("APAC Subcontract") to furnish labor and materials for the installation of traffic signals and signage in connection with the Oakland Park Project.

Signal's scope of work under the APAC Subcontract included installation of mast arms for traffic signals and signage and Signal purchased these mast arms from PennSummit.  The mast arms were to have been galvanized and painted to conform with the requirements of the APAC Subcontract, which also includes FDOT's standards.

The mast arms were delivered by PennSummit to the Oakland Park Project site on April 5, 2006, and subsequently installed and incorporated into the Powerline Project by Signal.  Nearly two years later, on March 6, 2008, APAC was notified by FDOT that the paint on the mast arms on the Powerline Road Project was peeling and that the paint failure was the result of corrosion of the mast arms.

## 3.    The Instant Action

On March 31, 2009, Signal filed a complaint in state court against PennSummit seeking recovery of damages related to the defective mast arms.  This action was removed by PennSummit to this Court on April 30, 2009.  The operative complaint, Signal's Amended Complaint, was filed on May 26, 2009.  The Amended Complaint sets forth the following five claims against PennSummit:

3

Count I:      Breach of Contract (with regard to the Powerline Project)
Count II:     Breach of Contract (with regard to the Oakland Park Project)
Count III:    Breach of an Implied Warranty of Merchantability
Count IV:     Breach of an Implied Warranty of Fitness for a Particular
              Purpose
Count V:      Common Law Indemnity

## 4.    Signal's Damages

Signal sought recovery in this action of the costs relating to repair and/or

replacement of the defective structures. It is undisputed that, as of the date of the trial

in this action, Signal did not effectuate any such repair and/or replacement of the mast

arms. When filing its original Rule 26 Disclosures on June 18, 2009, Signal stated that

it "is in the process of calculating its damages. Signal will supplement its response to

this item after its damages have been determined." DE 92 ¶ 11.

On November 2, 2009, Signal first disclosed its potential damages when Signal

responded to PennSummit's first set of interrogatories. With regard to both projects,

Signal disclosed that it was seeking a combined total of $650,459.59 which was

purportedly necessary to replace certain structures and to repair/repaint the remainder.

Specifically, the Oakland Park Project includes twenty-six structures (which

consists of twenty-six uprights and twenty-seven mast arms). In its November 2, 2009

interrogatory answers, Signal asserted that, with regard to the Oakland Park Project,

only seven mast arms needed to be replaced and the remainder of the structures

needed to be repainted. With regard to the Powerline Project, Signal asserted that its

damages consisted of the costs of replacing one mast arm and repainting the remaining

affected six uprights.

In May 2010, Signal's Executive Vice President, Jeffrey M. Kleiss, determined

4

that "due to the evident . . . rapidly deteriorating condition of the mast arms, . . . the mast arm structures must be removed and replaced." DE 99-1 ¶ 16. Accordingly, on June 9, 2010, Signal disclosed a new estimate of damages. Signal asserted a claim for damages nearly double its original calculation: $1,142,842.00. This new figure was premised upon Signal's assertion that its prospective damages now include the cost of replacing all twenty-six mast arms on the Oakland Park Project and replacing six mast arms on the Powerline Project.

## 5.    Related State Court Proceedings

Several months following the commencement of this action, FDOT sued Ranger and APAC in separate lawsuits in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida. According to Signal, "[i]n each of those cases, Signal has recognized its contractual obligations to APAC and Ranger and has agreed to defend and indemnify APAC and Ranger for any damages they incur in those lawsuits." DE 99 at 10-11.

## 6.    Summary Judgment

On August 3, 2010, the Court entered an Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment which granted Defendant's summary judgment motion with respect to Count V (Common Law Indemnity) and it was denied in all other respects. One of Defendant's primary arguments was that Signal's damage estimates concerning future repairs of the mast arms were unripe and speculative. In rejecting this contention, the Court stated that "'Florida courts allow contractors to recover when necessary repairs, occasioned by a breach, have not been started; the

5

contractor must be able to show the <u>anticipated</u> cost with reasonable certainty.'" DE
113 at 7 (quoting <u>Lazovitz, Inc. v. Saxon Constr., Inc.</u>, 911 F.2d 588, 591 (11th Cir.
1990) (emphasis in original)).  The Court then compared this action to <u>Nebula Glass</u>
<u>Int'l, Inc. v. Reichhold, Inc.</u>, 454 F.3d 1203 (11th Cir. 2006), which involved allegedly
defective resin used to make glass.  There, the court rejected an argument that
plaintiff's future damages were speculative because the plaintiff presented evidence to
establish that the "glass <u>will</u> fail and that [a third party] <u>will</u> seek replacement costs." <u>Id.</u>
at 1212 (emphasis in original).

PennSummit also maintained that "Signal lacks the requisite standing to proceed
in this action against PennSummit based upon the alleged future cost to repair and/or
replace the property of a third party (here, FDOT)." DE 91 at 6.  Again relying on
<u>Nebula</u>, the Court rejected this argument reasoning as follows:

> Here, FDOT has brought suits demanding that APAC and Ranger correct
> the defective mast arms furnished by PennSummit.  In turn, APAC and
> Ranger demanded that Signal hold both contractors harmless in
> connection with these claims.  Signal entered into joint defense and
> indemnification agreements with both APAC and Ranger in which Signal
> agreed to defend, indemnify and hold the contractors harmless from
> FDOT's claims.  Indeed, Signal has unequivocally stated that "Signal is
> responsible to APAC and Ranger for the peeling and rusting mast arm
> structures furnished by PennSummit." DE 99 at 6.
>
> This presents an even stronger case than <u>Nebula</u> in which the third-
> parties had not yet filed claims against the plaintiff. <u>See</u> <u>Nebula</u>, 454 F.3d
> at 1213 ("The possibility that the college and Dependable Glass would fail
> to seek recovery from [plaintiff] for replacement of the defective glass is,
> indeed, remote.").  Accordingly, the Court rejects PennSummit's argument
> that summary judgment should be granted for lack of standing.

DE 113 at 10.

## 6.    Trial and Settlement

The case proceeded and a jury trial was conducted from August 9, 2010 to August 13, 2010. As described in PennSummit's Motion, "[o]n Wednesday, August 11, 2010, at the close of Trial Day 3 and outside the presence of the jury, PennSummit informed the Court that approximately an hour earlier, it had reached a settlement with FDOT." DE 154 at 8. The Settlement Agreement and Release ("Settlement") provides that "PennSummit will perform the remediation work required by the FDOT (as opposed to that work estimated or predicted by Signal)." Id. (emphasis in original). Pursuant to the Settlement, "the FDOT fully released PennSummit, Signal, the prime contractors, and all related entities from any liability or obligations arising out of the materials and the projects." DE 154 at 1.

Based on the Settlement, PennSummit argued that Signal's claims should be dismissed. Signal objected. The Court determined that it would be prudent to complete the trial and address the impact of the Settlement, if any, post-verdict. In addition, the Court informed the parties that the jury would not be made aware of the Settlement. Thereafter, the jury returned a verdict in favor of Signal and awarded $1,142,842 in damages. The award consisted of $1,112,697.79 in future damages, and $30,144.21 in past damages.

## 7.    The Instant Motion

PennSummit argues that (1) Signal's prospective future damages claims in this case "were immediately extinguished" once PennSummit and the FDOT entered into the Settlement; and (2) there was "no evidence or testimony presented at trial sufficient to support a verdict for any past damages." DE 154 at 1-2. Accordingly, PennSummit contends that it is "entitled to dismissal of Signal's claims or, alternatively, judgment as

a matter of law and/or remittitur."  Id. at 2.

In response, Signal asserts a number of counterarguments.  First, Signal states that the argument that the Settlement extinguishes Signal's future damages is based on the legal defense of release.  "PennSummit, however, did not plead the defense of release.  Nor did PennSummit seek leave during trial to amend its affirmative defenses to add the defense of release."  DE 156 at 1.  Second, Signal argues that the Settlement "does not alter Signal's contractual responsibility and corresponding right to maintain the mast arms . . . ."  Id.  Third, Signal posits that the Settlement agreement is void because it "is an *ultra vires* contract."  Id. at 15.  Fourth, Signal contends that PennSummit's Alternative Rule 50(b) motion argues matters beyond the scope of its original Rule 50(a) motion.  Fifth, Signal argues that PennSummit has "waived the argument of past and future damages . . . ."  Id. at 18.  Finally, Signal identifies the evidence admitted at trial which supports the jury's award of past damages.

In reply, PennSummit argues that Signal's Opposition contains a myriad of red herrings and fails to address the critical issue.  Specifically, PennSummit states as follows:

> Signal asks the Court to ignore the fact that throughout this litigation, the entire basis for the damages claims it was pursuing (as evidenced by its pleadings, Rule 26 disclosures, answers to interrogatories, response to PennSummit's motion for summary judgment and, most importantly, evidence presented by Signal at trial) was based upon Signal's anticipated cost/obligation to either repair, repaint or replace some or all of the overhead structures/mast arms at issue in this case.  This Court previously determined that Signal had standing and the right to pursue these damages claims (despite the fact that Signal had not even commenced this work) based upon the claims asserted by the FDOT against Ranger and APAC, which resulted in the claims asserted by Ranger and APAC against Signal in state court.

DE 157 at 2.  In light of the foregoing, PennSummit claims that "[o]nce FDOT, the

8

owner of the property at issue, elected to pursue its own remediation plan and released

Signal, APAC and Ranger from any and all liability arising out of the projects, the only

source of damages claimed in this case cease to exist."  Id.

## II. ANALYSIS

1.    **Impact of the Settlement on Future Damages**

This action was premised on Signal's allegation that the mast arms provided by

PennSummit were defective and, therefore, the mast arms will need to be repaired

and/or replaced to ensure that Signal is not liable to the FDOT, APAC or Ranger.  For

example, in opposing PennSummit's motion for summary judgment, Signal claimed that

"the structures no longer meet FDOT's specifications for steel thickness and must now

be replaced."  DE 99 at 2.  With respect to Signal's obligation to correct any defects in

the mast arms installed at the two projects, Signal explained as follows:

> FDOT has demanded that APAC correct the defective mast arms
> furnished by PennSummit [DE 49-2]. APAC demanded that Signal
> defend, indemnify and hold harmless APAC from the claims made by
> FDOT [DE 53-5, p. 1]. Signal and APAC subsequently entered a Joint
> Defense and Indemnification Agreement in which Signal agreed to
> defend, indemnify and hold harmless APAC from FDOT's claims [Id.].
>
> . . .
>
> FDOT has demanded that Ranger correct the defective mast arms
> furnished by PennSummit [DE 49-1]. Ranger demanded that Signal
> defend, indemnify and hold harmless Ranger from the claims made by
> FDOT [DE 53-6, pp. 1-2]. Signal and Ranger subsequently entered a Joint
> Defense and Indemnification Agreement in which Signal agreed to
> defend, indemnify and hold harmless Ranger from FDOT's claims [Id.].

Id. at 5-6.  Moreover, as discussed above, the fact that the FDOT brought suit against

APAC and Ranger was a critical point in the Court's order denying PennSummit's

motion for summary judgment.  As a result of the Settlement, Signal is not liable for any

of the future repair or replacement costs which were at issue in this case.  Specifically,

in the Settlement, the FDOT agreed to release, among others, PennSummit, Signal, APAC and Ranger "from any and all claims, damages, causes of action, or any potential recovery whatsoever, known or unknown, arising from the products provided by [PennSummit] on the Oakland Park and Powerline projects in Broward County, Florida (the 'Projects')." DE 154-2 ¶ 1.[1] In addition, the FDOT agreed to "dismiss with prejudice all of its claims pending in the Circuit Court of Broward County, Florida involving the Projects and these and other parties, costs taxed as paid." Id. ¶ 2 (emphasis in original).

In opposing the Motion, Signal argues that the "FDOT-PennSummit Settlement Agreement releases Signal only from claims by FDOT for 'products provided by [PennSummit].' It is not a full release of Signal for products Signal furnished or from claims by third parties, including Broward County, Ranger and APAC." DE 156 at 6.[2] The Settlement is, however, a full release of the future liability that was at issue in the litigation before this Court. At trial, the Court had the following exchange with Signal's counsel regarding the impact pf the Settlement on Signal's estimated future repair costs:

---

[1]     The Settlement also states that "[i]t is the intention of the parties for there to be no further litigation arising from the Projects." DE 154-2 ¶ 1.

[2]     Signal submitted the Affidavit of Jeffrey M. Kleiss which described some of the products not furnished by PennSummit such as, *inter alia*, signals, conduit, wire and pedestrian detectors. See DE 156-1 ¶ 3. The affidavit states that "[t]here are numerous ways the contractor hired by PennSummit to perform the work contemplated by the [Settlement] could fail to remove or improperly remove and reinstall/reconnect, or otherwise damages these products in such a manner that could lead to damage to property, personal injury and/or death, which I anticipate would lead to lawsuits filed against Signal, for which FDOT has not released Signal." Id. These potential claims were not part of this action. The Court also finds that the statements in the Kleiss Affidavit are speculative and fail to present any claims that could now be established by the reasonable certainty required under Florida law.

10

COURT:          Let me ask you this: As I understood this lawsuit at
                the outset, that it was all about the mast arms in their
                current condition not meeting FDOT specifications.
                Period.

MR. LAWRENCE: Correct.

COURT:          Well now, FDOT is satisfied.

Day Four Tr., at 15.  Plaintiff's counsel's statement was not a revelation, but rather a

confirmation of the theory of the case maintained by Signal throughout the litigation.

Accordingly, the Court concludes that, in light of the Settlement, the jury's award for

"future damages" will be eliminated from the final judgment.

## 2.    The Affirmative Defense of Release

Signal argues that PennSummit's Motion is premised on the affirmative defense

of release.  According to Signal, because PennSummit did not move to amend its

affirmative defenses to include release, "the Court here should uphold the jury's verdict

against PennSummit where PennSummit failed to make 'release' an issue."  DE 156 at

9.

In the Reply, PennSummit asserts the following:

[T]hese arguments were not raised when the settlement agreement was
presented to the Court and the parties were discussing their respective
positions on the impact of that agreement on the estimated future
repair/replacement damages claim Signal was asserting in this lawsuit.  In
its memorandum, Signal does not point to a single place in the record
where it previously raised such arguments, and it is therefore obvious that
it is attempting to pull an after-the-fact 'gotcha,' which should not be
countenanced by the Court.

....

Moreover, the Settlement Agreement did not constitute an affirmative
defense of "release" as to the plaintiff Signal, since PennSummit is not
asserting that Signal released PennSummit with respect to the claims at
issue. Instead, in the Agreement, the FDOT released Signal, Ranger and
APAC from all claims and all obligations relating to the Oakland Park and
Powerline Projects and agreed to dismiss, with prejudice, the breach of
contract claims filed against Ranger and APAC in the state court actions

(no claims were asserted by FDOT directly against Signal).

DE 157 at 3. The Court agrees with PennSummit. PennSummit brought the
Settlement to the Court's and Signal's attention shortly after its execution. While
PennSummit did not use the words "affirmative defense," PennSummit made its
position clear, that the Settlement Agreement eliminated all damages related to Signal's
claims in this lawsuit.[3]

Signal also argues that the Settlement was not admitted into evidence nor
presented to the jury. As discussed, the Court specifically instructed that the
Settlement not be disclosed to the jury. In addition, the import of the Settlement on the
jury's verdict is a matter of law for the Court to determine. See Peacock Constr. Co.,
Inc. v. Modern Air Conditioning, Inc., 353 So. 2d 840, 842 (Fla. 1977) ("the general rule
is that interpretation of a document is a question of law rather than of fact"); Jones v.
Wynne, 266 Fed. App'x 903, 906 (11th Cir. 2008) (the "construction of a settlement
agreement is a question of law"); Mulhern v. Rogers, 636 F. Supp. 323 (S.D. Fla. 1986)
("Where the intent can be ascertained from the unambiguous language of the
instrument, construction of the document is a question of law for the Court.").

2.     **Signal's Duty to Maintain the Mast Arms**

Signal argues that the Settlement "does not affect Signal's responsibility to
maintain the mast arms, including repairing and/or replacing defective mast arms,

---

[3]     Rule 15(b)(1) provides that "[i]f, at trial, a party objects that evidence is not
within the issues raised in the pleadings, the court may permit the pleadings to be
amended." Fed. R. Civ. P. 15(b)(1). Although Signal protested the issue on the merits,
i.e., arguing that the Settlement did not extinguish damages, Signal did not raise the
argument that consideration of the issue was precluded because PennSummit did not
raise the affirmative defense of release. Had Signal objected on the grounds it now
asserts, the Court could have permitted PennSummit to amend its affirmative defenses.

furnished by PennSummit, and does not alter Signal's contractual prerogative to correct the defective mast arms, . . . ." DE 156 at 11.  Further, "Signal's duty to maintain the mast arms is owed to Broward County pursuant to Section 611-2.2 of the 2004 FDOT Specifications.  This duty is not affected or extinguished by the [Settlement], as neither Broward County nor Signal (or APAC or Ranger) are parties to the settlement agreement."  Id. at 13.

PennSummit raises two arguments in response.  First, Signal does not have a contract with the FDOT, rather "[o]nly APAC and Ranger are deemed to be the 'Contractor' under the FDOT specifications.  Signal is merely a third-party who owes obligations under its own subcontracts with APAC and Ranger."  DE 157 at 7.  Second, "each of the provisions cited by Signal also dictates that FDOT (as the owner) has the right to elect or approve the remedy/repair it, as the owner, deems appropriate.  Signal has no right to impose its view that all of the mast arms need to be replaced including the ones which the FDOT deems only need to be repainted."  Id. at 8 (emphasis in original).

The Court rejects Signal's position.  As mentioned, Signal's theory of damages was based on the cost to investigate, repair and/or replace the defective mast arms and defend against claims by the FDOT, which reach Signal through its obligations to APAC and Ranger.  Moreover, at trial the parties disputed the estimated costs to repair or replace the mast arms in order to bring the structures into compliance with FDOT specifications.  At the heart of that dispute, was what exactly needed to be done to satisfy the FDOT.  The Settlement's broad language not only addresses the defects at issue here, but it does so to the unequivocal satisfaction of the FDOT.

### 3.    The Settlement Is Not Illegal

Signal contends that the Settlement has "no bearing on this case because it is an *ultra vires* contract." DE 156 at 15. Specifically, Signal asserts that Florida Statutes, ¶¶ 337.11(3)(b) and 337.11(4) required a competitive bidding process whereby the FDOT would award the "contract" to repair the mast arms to the FDOT-qualified entity who submitted the lowest bid.

Signal's argument is premised on a characterization of the Settlement as a "construction contract[ ] greater than $250,000." Fla. Stat. § 337.11(3)(b). The Court disagrees that the statutory scheme cited by Signal applies to the Settlement. See Sperry Corp. and its Sperry Univac Div. v. Minneapolis, 680 F.2d 1234, 1238 (8th Cir. 1982) (affirming district court's determination "that under Minnesota law the competitive bidding laws did not include an agreement in settlement of a contract dispute which did not require expenditure of public monies"). As PennSummit points out, the "FDOT is not paying anyone for the remediation work which PennSummit is providing . . . ." DE 157 at 9.[4] Further, even if the Court were to assume that the statutory scheme does apply, the Court finds that the Settlement is properly characterized as a "supplemental agreement" which does not include the requirements cited by Signal. See Fla. Stat. § 337.11(9).

### 4.    Rule 50(b) Does Not Bar the Motion

Signal argues that the Court cannot consider the Settlement because PennSummit did not raise this issue in its motion pursuant to Rule 50(a). The

---

[4]    Signal cites Robert G. Lassiter & Co. v. Taylor, 99 Fla. 819 (Fla. 1930), however, that case involved a situation where a contract "was subsequently modified to provide for an entirely different type of work at a different price, without submitting the contract for the work as modified to competitive bids." Id. at 821.

Settlement did not exist at the time of PennSummit's Rule 50(a) motion. However, after the Settlement was executed and brought to the Court's attention, PennSummit immediately raised the arguments contained in the instant Motion. The Court denied these motions without prejudice and directed the parties to brief the issue after the jury returned its verdict. Accordingly, the Court will decide the Motion on the merits.

### 5. Waiver Regarding Past and Future Damages

According to Signal, PennSummit has "waived the argument of past and future damages . . . ." Id. at 18. This argument is based on the fact that PennSummit proposed a verdict form which contained a single line for damages and "if it had been granted by the Court – would make the [distinction] of past vs. future damages issue irrelevant." Id. PennSummit's proposed verdict form, however, was not accepted. Instead, the Court adopted Signal's proposal to include separate lines for past and future damages in connection with each project. Signal's proposal was made after the Settlement was disclosed. Therefore, PennSummit has not waived its right to raise arguments based on the actual verdict form used.

### 6. Evidence Regarding Past Damages

In considering the evidence presented at trial in connection with a Rule 50(b) motion, a court must draw all factual inferences and resolve all credibility determinations in the favor of the nonmoving party. See Munoz v. Oceanside Resorts, Inc., 223 F.3d 1340, 1344 (11th Cir. 2000). A Rule 50(b) motion should be granted only where "reasonable [jurors] could not arrive at a contrary verdict." Id. at 1344-45. Similarly, "'[r]emittitur' is the procedural process by which an excessive verdict of the jury is reduced. It is well understood that a 'jury's verdict should not be disturbed if there is competent evidence in the record to support it.' When considering a motion for

remittitur, the standard for determining the appropriateness of the award is whether it 'exceeds the amount established by the evidence.'" Moses v. K-Mart Corp., 905 F. Supp. 1054, 1057 (S.D. Fla. 1995) (internal citations omitted). PennSummit's request for this Court to set aside or reduce the jury's verdict with respect to "past damages" fails under either standard.

As set forth in Signal's Opposition, competent evidence existed in the record to support the jury's verdict:

> The jury award for "past damages" in the amounts of $11,411.00 on the Powerline Project and $18,733.21 on the Oakland Park Project [DE 138, ¶¶ 5, 10] is supported by the evidence. Signal's Trial Exhibit 48, described as "Costs for Replacement/Repair of Mast Arms," was admitted into evidence without objection. Signal's Trial Exhibit 48 shows costs of $18,733.21 for video scoping on the Oakland Park Project and costs of $11,411 for video scoping on the Powerline Project – the identical amounts awarded by the jury.

DE 156 at 19. In addition, Signal cites to testimony from Howell Abrams and Jeffrey Reeves and Signal's Trial Exhibit 48. See id. at 20. In its Reply, PennSummit fails to address how the evidence described above does not support the jury's verdict. Accordingly, the Court will not disturb the jury's award of "past damages."

## III. CONCLUSION

Based on the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendant's Combined Renewed Motion to Dismiss or, Alternatively, Motion for Judgment as a Matter of Law and Motion for Remittitur [DE 154] is **GRANTED in part and DENIED in part**. The Motion is granted with respect to "future damages" which will be excluded from the final judgment. The Motion is denied with respect to "past damages" which will be included in the final judgment. Accordingly, by separate order, the Court will enter a final judgment in favor of Signal and against PennSummit in the

amount of $30,144.21.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County,

Florida, on this $\underline{1^{st}}$ day of September, 2010.

**JAMES I. COHN**
**United States District Judge**

Copies provided to:

Counsel of record via CM/ECF